# Presidential Implementation of Emergency Powers Under the International Emergency Economic Powers Act

The President may issue a single executive order invoking the remainder of his powers under the International Emergency Economic Powers Act, in response to the situation in Iran, which would permit him to block the property of Iranian citizens as well as that of their government, and to effect a complete trade embargo. The President may delegate the exercise of all implementing powers to the Secretary of the Treasury. Such an order need not declare a new emergency, but could simply find that the underlying emergency continues, and such an order need not be accompanied by an immediate report to Congress.

November 21, 1979

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This responds to your question of November 14, 1979, whether future actions under the International Emergency Economic Powers Act (IEEPA) (50 U.S.C. §§ 1701–06 (Supp. I 1977)) that are not within the scope of Executive Order No. 12,170 3 C.F.R. 457 (1979) can be authorized by a single executive order invoking all the statute's powers and granting the Secretary of the Treasury discretion to take any particular action, or whether there must be a separate executive order for each incremental step. Executive Order No. 12,170, "Blocking Iranian Government Property," confines itself to blocking the property of "the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran." The IEEPA also includes authority to limit or prohibit any transfer of property subject to U.S. jurisdiction in which a foreign national has an interest. § 1702(a). This would authorize blocking the property of Iranian citizens as well as that of their government, and a complete trade embargo.[1] If the President determines that the authority to make these rather basic policy decisions should be delegated to the Secretary of the Treasury, we believe that delegation could be legally accomplished by issuing a single executive order authorizing use of the IEEPA's remaining provisions, and that a blanket delegation of implementing authority to the Secretary would be consistent with the statute.

---

[1] The legislative history of the Export Administration Act of 1979, Pub. L. No. 96–72, 93 Stat. 503, 50 U.S.C. App. § 2401 *et seq.*, makes clear that total trade embargoes are to be accomplished under the IEEPA, rather than by export controls. *See* the conference report, 125 Cong. Rec. 26,593 (1979). Partial embargoes can, of course, be accomplished through export control.

Two preliminary points should be made. First, there should be no need for further declarations of national emergency while the present crisis exists. The IEEPA allows the exercise of "any authority" under its substantive grants in § 1702 once an emergency is declared to deal with an external threat to the national security, but requires a new declaration for a "new threat." § 1701. This reflects purposes the IEEPA shares with the National Emergencies Act, 50 U.S.C. § 1601–51, to prevent the indefinite duration of national emergencies and to provide Congress an opportunity to terminate any particular emergency by concurrent resolution. S. Rep. No. 466, 95th Cong., 1st Sess. 2 (1977). The statute and its history provide little help in defining what is a "new threat" requiring a new declaration of emergency, beyond the general purpose of preventing emergencies from surviving long past their initiating cause. The situation in Iran seems clearly to constitute a single, continuing emergency.

Second, the Emergencies Act requires the President to specify "the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631. Such a specification is to be made in the declaration of emergency or in "one or more contemporaneous or subsequent executive orders published in the Federal Register and transmitted to Congress." *Id.* Invocation of emergency powers other than those in the IEEPA to deal with Iran would thus require a new executive order specifying the statutes involved.

The IEEPA appears to assume that the President will take a series of implementing actions under a single declaration of national emergency, and that not all of these need be done by executive order. First, under § 1701(a), "any authority" granted by § 1702 may be exercised to deal with a particular threat. Second, the powers granted in § 1702 are phrased in a fashion that contemplates a series of different actions: "the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise [take authorized substantive actions]." Third, the requirement in § 1703(b) to report to Congress on the exercise of "any of the authorities" of the Act is clearly tied to the initial declaration of an emergency, and is followed in § 1703(c) by a requirement for follow-up reports at least each six months, describing actions taken under the statute and important new information. Fourth, § 1704 delegates broad power to the President to "issue such regulations, . . . as may be necessary" to implement the Act. And fifth, the Emergencies Act, 50 U.S.C. § 1641, requires the President to keep a file of his significant orders, "including executive orders," and requires each executive agency to keep a file of its rules, issued pursuant to an emergency. These are then to be transmitted promptly to Congress. § 1641(b).

The Emergencies Act contemplates subdelegation of presidential functions in two provisions mentioned above (§§ 1631, 1641(a–b)). The

147

IEEPA does not explicitly authorize subdelegation, but there is implicit support for it in the existence of rulemaking power and in references to a number of implementing actions (*e.g.,* "licenses" in § 1702(a)(1)). Nothing in the statute or its history suggests the unavailability of the President's general powers of subdelegation under 3 U.S.C. §§ 301–02, which allow delegation of "any function which is vested in the President by law" to a cabinet member (§ 301), "if such law does not affirmatively prohibit delegation. . . ." (§ 302.)

We therefore conclude that the President may issue a single executive order invoking the remainder of his powers under the IEEPA, and delegating their exercise to the Secretary of the Treasury. Such an order could find that the underlying emergency continues and necessitates the invocation of all powers remaining under the IEEPA. It could then restate the penultimate sentence of Executive Order No. 12,170, with the appropriate changes (italicized here): "The Secretary is authorized to employ all powers granted to me by the International Emergency Economic Powers Act *regarding the property of Iran or Iranian nationals.*" It does not appear to be necessary to accompany such an order with an immediate report to Congress, for reasons stated above.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*
